IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 10, 2011 Session

## STATE OF TENNESSEE v. MARCUS DONNELL JONES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2856    J. Randall Wyatt, Jr., Judge**

**No. M2010-02597-CCA-R3-CD - Filed January 9, 2012**

The Defendant entered a negotiated best interest plea to three counts of theft over $1,000. In accordance with the plea agreement, the Defendant received an effective sentence of six-years, to be served on probation, and the State dismissed other pending charges against him. The parties agreed to allow the trial court to determine whether the Defendant's probationary status should be governed by the judicial diversion provisions of Tennessee Code Annotated section 40-35-313. After a hearing, the trial court denied the Defendant's request for diversion. The Defendant now appeals that judgment. After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

David A. Collins, Nashville, Tennessee for the appellant, Marcus Donnell Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General, and Robert Homlar, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the Defendant's actions and practices through his Nashville-based business, Jones Memorials, through which he engraved granite tombstones. The Defendant received orders for tombstones, accepted payment for the orders, but he failed to

fulfill those orders. Based upon this conduct, a Davidson County grand jury indicted the Defendant for fifteen counts of theft of property over $1,000 but less than $10,000; five counts of theft of property over $500 but less than $1,000; one count of theft of property less than $500; and one consolidated count of theft of property over $10,000 but less than $60,000.

The Defendant entered a best interest plea to three out of the twenty-two counts charged against him. He pled guilty to three counts of theft of property over $1,000 but less than $10,000, and, in exchange for his plea, he received a sentence of two years on each count, to be served consecutively, as a Range I offender. Per the plea agreement, the State agreed the sentence should be suspended in favor of placing the Defendant on probation. The State dismissed the remaining nineteen counts.

The trial court held a sentencing hearing to determine the Defendant's eligibility for judicial diversion under Tennessee Code Annotated section 40-35-313. At the hearing, Nathan Casey, a paralegal for the Tennessee Attorney General's Office in the Consumer Protection Division, testified that the Attorney General's Office received referred complaints from the Tennessee Division of Consumer Affairs, the Better Business Bureau, and the Federal Trade Commission regarding the Defendant's tombstone business and his websites promoting it. Casey testified that the Attorney General's Office received "approximately [one] hundred" complaints regarding the Defendant and the Co-Defendant, Wayne Monk. As the Attorney General's Office investigated the complaints, it amassed "about four banker boxes" full of documents detailing the Defendant's actions. Casey identified copies of the documents, testifying that they were invoices for granite tombstones. Casey testified that he had read all of the documents the Attorney General's Office had collected regarding the complaints. Casey stated that some of the documents may have been duplicates, but he could not "quantify it."

Casey testified that, based on that information, the Attorney General's Office "filed a civil lawsuit against [the Defendant] and the websites he operated." As a result of this litigation, the civil court entered a final judgment and permanent injunction by default against the Defendant. The final judgment ordered the Defendant to reimburse approximately $96,000 in restitution to the victims. With attorney's fees and civil penalties, the total amount owed by the Defendant exceeded $320,000. Casey stated that the Defendant's attorney for the civil lawsuit, Karl Warden, was present when the trial court entered the default judgment against the Defendant.

Detective David B. Howard, a supervisor in the Fraud Unit of the Metropolitan Nashville Police Department, testified that he became involved in the Defendant's case in 2004 when " calls started coming in from all over the nation as it related to [the Defendant],

2

Jones Memorials," in which people complained that they paid the Defendant for products and services that they never received. Detective Howard testified that he visited the Defendant's office in 2004 and either late 2007 or early 2008 because "each time we had a handful of reports that were being made, a lot of reports, a lot of calls coming in but it just did not seem to, well, about that time he was still to some degree a viable business man, it seemed." Detective Howard stated that, at the time of his second visit, "we just had a handful of police reports made . . . ." Detective Howard testified that "those in and of themselves were not enough at that time to make it cross that fine line between being a poor business man and a criminal." As Detective Howard investigated further, he determined that he needed to send the matter to the Attorney General's Office for "a civil disposition or approach to it because it was still, it seemed what he was doing was criminal, but it was still very hard to prove." Detective Howard testified that the civil investigation led to a criminal matter after "all the facts were gathered by the Attorney General's [O]ffice and we looked at it closely . . . [i]t was at that time that it was determined that there was close to a 100 victims and over $60,000.00 dollars in monetary loss . . . ."

On cross-examination, Detective Howard testified that, on his visits to the Defendant's business, the Defendant appeared to be behind in processing his orders. The last time Detective Howard visited him, in either late 2007 or early 2008, he told the Defendant "to stop what he was doing, because he was so far behind at that time and there was stones from '04 and '05 that he had not given people yet." Both times Detective Howard visited the business, he walked through "the entire property" and observed stones at the business, but he testified that "there was no more than two stones on the property nor [was] all the equipment there to finish those stones and get it done." Detective Howard stated that "[e]verytime there was excuses why things weren't done, yet [the Defendant] continued at that time to take money and take orders in and yet he was not fulfilling them at all." He further testified that the Defendant had a number of excuses for his inability to complete the orders in a timely manner, including statements that something had been stolen, he had injuries from a car accident, and the equipment did not work.

Lastly, the Defendant testified that he entered a best interest plea but said his incentive in doing so was to avoid the risk of a felony conviction from a jury and such a conviction appearing permanently on his record. He further testified that the trial court entered the civil default judgment "totally against my knowledge or my permission" because he was not present in the courtroom on the day of the default judgment. He testified that he did not authorize his civil attorney to agree to the default judgment against him. The Defendant, however, stated that he hired and paid his civil attorney.

The Defendant then identified a set of invoices showing that the Defendant placed orders for "blank granite material" that he would stencil, engrave, and send to customers.

He testified that "well over 180 pieces of stone still [sit] dormant on the property and contrary, no disrespect to the officer that came, he did come and talk to me and I walked him around[,] I have always had more than two stones." The Defendant claimed that, during the time period covered by the indictment, he "still ordered and finished orders, shipped out orders . . . I did everything I could to keep from filing bankruptcy and of course, it ended up coming to this." He testified that he had knowledge of the injunction that barred him from continuing his business, but he claimed he never received a copy from his attorney nor from the Attorney General's Office.

The Defendant also identified a "mass e-mail" dated February 28, 2008, that he prepared to send to all of his customers to inform them of the reason for the delay in their orders. He testified that he was unsure if the email had been sent after his website "had been hijacked by Mr. Wayne Monk" because the email host company "was having problems with their service."

The Defendant stated that his "sole intention" was to provide stones to customers. He testified that he experienced several complications and problems "that prevented [him] from completing orders on time, but it never was or never will be my intention not to do what people ordered." He continued that he "never took anything from anybody." He testified, that he "received payment" and "ordered supplies." He also stated that he "did have an accident . . . [and] have things stolen." Although that "sounds like . . . excuses, . . . they were documented facts" that showed that "never ever was it my intention" not to complete the work. He stated that he "was always up-front," and he "never would have ordered all of that material, spent the money, had I not intended on doing the work."

On cross-examination, the Defendant acknowledged that the letter the Defendant prepared to send to customers to explain the delays, which defense counsel previously referred to as a "mass e-mail," was dated March 12, 2008. The Defendant admitted that the car accident mentioned in the letter happened in 2005, but it "snowballed into some other problems," including cold weather and stolen equipment.

The Defendant testified that he understood that he was no longer licensed to practice his trade in Tennessee and that it was a felony to do so. He stated that, after he ceased his business, he wrote and posted an opinion statement on his Jones Memorial website regarding the various complaints, investigations, and civil and criminal proceedings against him. He agreed that the opinion stated that Circuit Judge Barbara Haynes, his civil attorney Karl Warden, and named victims were aligned against him and the justice system in Tennessee and nationwide is "crooked." The Defendant explained that he is "39 years old and have never been involved in anything like this and when you come to court it seems like the whole deck is against you so this particular [opinion post] here is my synopsis."

4

The Defendant further identified an email he sent to a client, a secretary at Holy Name of Jesus Parrish. In the email message, he told Doris that "payback is a mother." He explained that "[m]y email to Ms. Doris was simply because [the Co-Defendant] whom I had fired was giving her false information about her order." He stated that he responded to Doris after she threatened him over the telephone. He continued, "[S]he was threatening me, and . . . payback is a mother when you . . . take matters into your own hands and try to have a kneejerk reaction and just accuse me of something that is not actual then I guess you will get it down the road."

After taking the matter under advisement, the trial court issued an order that denied judicial diversion to the Defendant. The order stated that "[t]he court rests its decision on the following factors: the [D]efendant's amenability to correction, the circumstances of the offense, the deterrent value to the [D]efendant and others, and the interests of the public."

## II. Analysis

On appeal, the Defendant argues that the trial court abused its discretion when it denied his request for judicial diversion.

The State originally submitted a procedural argument to support its contention that the Defendant's argument should fail on jurisdictional grounds. The State, however, withdrew that argument at oral argument. As a result, this opinion does not address the procedural argument originally submitted by the State; we address this case on the merits.

Where a defendant is eligible for judicial diversion, a judge has the discretion to defer proceedings without entering a judgment of guilty. T.C.A. § 40-35-313(a)(1)(A) (2010). The statute states that a trial court may grant judicial diversion in appropriate cases. *Id.* Following a grant of judicial diversion, the defendant is on probation but is not considered a convicted felon. *Id*. To be eligible for judicial diversion, a defendant must be a "qualified defendant" as defined by the Tennessee Code section governing judicial diversion:

> (B)(I) As used in this subsection (a), "qualified defendant" means a defendant who
> (a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;
> (b) Is not seeking deferral of further proceedings for a sexual offense, a violation of § 71-6-117 or § 71-6-119 or a Class A or Class B felony; and
> (c) Has not previously been convicted of a felony or a Class A misdemeanor.

5

T.C.A. § 40-35-313(a)(1)(B)(I) (2010). Eligibility does not automatically entitle the Defendant to judicial diversion. *State v. Bonestal*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

Once a defendant is deemed eligible for judicial diversion, the trial court must consider several factors when deciding whether to grant judicial diversion. Due to the similarities in pre-trial diversion, which is administered by the district attorney general, and judicial diversion, courts draw heavily from pre-trial diversion law and examine the same factors:

> [A court] should consider the defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that [judicial] diversion will serve the ends of justice and best interests of both the public and the defendant.

*State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Additionally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." *Id*. (citing *Bonestal*, 871 S.W.2d at 168).

The Defendant contends that the trial court failed to establish the required factors to support its denial of judicial diversion. When a Defendant challenges the denial of judicial diversion, we review the trial court's decision under an abuse of discretion standard. *Cutshaw*, 967 S.W.2d at 344. We must conclude that "no substantial evidence exists to support the ruling of the trial court" in order to grant the Defendant relief. *Id*.

The trial court considered the evidence presented at the sentencing hearing and stated in the written order that it had "analyzed and weighed the aforementioned factors and finds that judicial diversion is not appropriate in light of the facts and circumstances of this case." The trial court first found that the Defendant's "testimony at the sentencing hearing demonstrated and corroborated his rather ardent belief in his actual innocence and theory that he has been victim at the hands of the State." As a result, the trial court concluded that the Defendant "did not feel his actions were wrong." For that reason, the trial court found that the Defendant was not amenable to correction.

The trial court then considered the circumstances of the multiple offenses, specifically

6

it heavily weighed the numerous complaints received by the Attorney General's Office from customers, all of whom complained that they never received products and services they had ordered from the Defendant. The trial court recognized that the Defendant had "suffered some serious setbacks with his business," but it noted that the Defendant "continued to take orders for new customers when the Defendant had not fulfilled orders taken from two or three years prior." The trial court found those circumstances to "weigh in disfavor of granting diversion."

The trial court also found that deterrence was a factor against granting diversion, stating that "dissuading others from transitioning from shrewd business practices to criminal actions is an important end." The trial court recognized that the injunction placed against the Defendant from continuing his tombstone business acted as a "civil deterrent mechanism." In explaining its denial of judicial diversion, the trial court stated that "the other dimension to the deterrent factor analysis is the deterrent value to others." Lastly, the trial court considered the interest of the public, finding that "denying judicial diversion, in this instance, would serve the manifest public interest of protecting vulnerable victims and furthering better business practices."

Based upon these factors, the trial court correctly denied judicial diversion to the Defendant. The trial court properly stated its reasons for denying judicial diversion, and substantial evidence in the record supports the findings upon which the trial court based its decision. Considering the circumstances of the offense, the Defendant's behavior since the arrest, the deterrent value to the Defendant and others, and the interests of the public, we conclude that the trial court did not abuse its discretion when it denied the Defendant judicial diversion. The trial court examined all the factors relevant to diversion and explained why the factors indicated diversion was not appropriate for the Defendant. The Defendant, therefore, is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

7